**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| CYNTHIA ALLEN and KRISTINE WEBB, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil No. 1:18-cv-3730-WMR |
| v. | ) | |
| | ) | |
| AT&T MOBILITY SERVICES LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MOTION TO EXCLUDE**
**THE OPINIONS OF JANICE F. MADDEN, Ph.D. AND**
**MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................1

II.   PLAINTIFFS' CLAIMS AND DR. MADDEN'S OPINIONS .....................2

III.  ARGUMENT..........................................................................................3

    A.   Dr. Madden Does Not Properly Compare AT&T's Alleged
        Treatment of the Putative Class to Similarly Situated Workers. .........5

        1.    Dr. Madden concedes that she erred by analyzing events
               when workers were not in Relevant Jobs and subject to
               the SAG. ...................................................................................6

        2.    Dr. Madden's opinions are inadmissible because her
               analysis did not focus on Retail Employees' Pregnancy
               Periods..................................................................................7

        3.    Dr. Madden's Opinions One and Two are inadmissible
               because her analysis ignored excuses available under the
               SAG.......................................................................................10

        4.    Dr. Madden's Opinion Three is inadmissible because her
               analysis ignores the progressive nature of SAG
               discipline. ............................................................................12

        5.    Dr. Madden's analysis goes outside the Class Period. ............14

        6.    Dr. Madden does not properly apply scientific methods........16

        7.    Dr. Madden did not account for relevant
               nondiscriminatory factors that affect FMLA denials and
               attendance discipline. ............................................................19

    B.   There is a pattern of favorable treatment for Dr. Madden's ever-
        pregnant workers. ..........................................................................22

        1.    Ever-pregnant workers generally had fewer FMLA
               denials. ...............................................................................22

        2.    Ever-pregnant workers generally had less discipline. ............24

IV.  CONCLUSION.....................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Bowers v. Norfolk S. Corp.*,
    537 F. Supp. 2d 1343 (M.D. Ga. 2007), *aff'd*, 300 F. App'x 700
    (11th Cir. 2008)...................................................................................20

*Brown v. Bibb Cty. Props., LLC*,
    602 F. App'x. 755 (11th Cir. 2015) .....................................................6

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).............................................................................3

*Cooper v. Southern Co.*,
    260 F. Supp. 2d 1305 (N.D. Ga. 2003), *aff'd*, 390 F.3d 695 (11th
    Cir. 2004) ...........................................................................................5

*Daubert v. Merrell Dow Pharm, Inc.*,
    509 U.S. 579, 113 S. Ct. 2786 (1993).......................................3, 4, 20

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
    317 F.R.D. 675 (N.D. Ga. 2016) .........................................................4

*FindWhat Investor Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) .........................................................15

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
    609 F.3d 1183 (11th Cir. 2010) ...........................................................1

*Hawkins v. Ceco Corp.*,
    883 F.2d 977 (11th Cir. 1989) .............................................................5

*Magbegor v. Triplette*,
    212 F. Supp. 3d 1317 (N.D. Ga. 2016)..............................................20

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) .........................................................20

*OFCCP v. Oracle Am., Inc.*,
    No. 2017-OFC-00006, 2020 WL 6112340, ALJ's Recommended
    Decision (Dep't of Labor Sept. 22, 2020) ...........................................8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Polypropylene Carpet Antitrust Litig.*,
  93 F. Supp. 2d 1348 (N.D. Ga. 2000)....................................................4

*Schaw v. Habitat for Humanity of Citrus Cty., Inc.*,
  938 F.3d 1259 (11th Cir. 2019) ..........................................................11

*Sher v. Raytheon Co.*,
  419 F. App'x 887 (11th Cir. 2011) .......................................................3

*Toth v. McDonnell Douglas Aerospace Servs. Co.*,
  31 F. Supp. 2d 1347 (M.D. Fla. 1998)..................................................6

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ..........................................................16

*Watkins v. Sverdrup Tech., Inc.*,
  153 F.3d 1308 (11th Cir. 1998) ............................................................4

*Zucco Partners, LLC v. FindWhat.com*,
  No. 2:05-cv-2001-Ftm-29DNF, 2008 WL 6154169 (M.D. Fla.
  Nov. 3, 2008) ......................................................................................15

**Statutes**

42 U.S.C. § 2000e(k) .............................................................................2, 6

Barbara T. Lindemann, Paul Grossman & Geoff Weirich,
  Employment Discrimination Law, Ch. 35 (6th ed.)................................4, 5, 6

**Other Authorities**

Fed. R. Evid. 702 ...................................................................................1, 16

## DEFENDANT'S EXHIBIT LIST

| Exhibit No. | Document | Bates Number |
|---|---|---|
| 1 | Rebuttal Report of Janet R. Thornton, Ph.D. dated March 31, 2021 ("Thornton Rep.") | n/a |
| 2 | Excerpts of the Deposition of Janice Madden, Ph.D. dated Oct. 20-21, 2020, and March 1, 2021 ("Madden Dep.") | n/a |

Defendant AT&T Mobility Services LLC ("AT&T") respectfully moves to exclude the opinions of Plaintiffs' proffered expert witness, Janice Fanning Madden, Ph.D. ("Dr. Madden"), submitted in support of Plaintiffs' Motion for Class Certification, dated September 14, 2020.[1]

## I.   INTRODUCTION

Rule 702 only permits expert opinions if four conditions are met. Those opinions must: (a) "help the trier of fact to understand the evidence or to determine a fact in issue"; (b) be "based on sufficient facts or data"; (c) be "the product of reliable principles and methods"; and (d) be the result of a "reliabl[e] appli[cation of] the principles and methods to the facts of the case." Fed. R. Evid. 702. Plaintiffs must prove that Dr. Madden's opinions meet these standards by a preponderance of the evidence. *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010). They cannot.

Fundamentally, the admissibility of Dr. Madden's opinions hinges on whether she properly compared AT&T's application of the Sales Attendance Guidelines ("SAG") to pregnant Retail Employees during the Class Period with AT&T's application of the SAG to similarly situated non-pregnant Retail

---

[1] The Expert Report of Janice Fanning Madden, Ph.D (September 14, 2020), filed as Exhibit 23 in support of Plaintiffs' Motion for Class Certification, is cited as "Madden Rep." The Amended Supplemental Expert Report of Janice Fanning Madden, Ph.D. (February 26, 2021), filed as Exhibit 46 to Plaintiffs' Motion for Class Certification, is cited as "Madden Supp. Rep.". At times, the Madden Rep. and the Madden Supp. Rep. are collectively referred to as Dr. Madden's "Reports."

Employees. Dr. Madden completely fails to do this. As shown by the analysis conducted by AT&T's expert, Janet R. Thornton, Ph.D. the data produced in discovery, properly interpreted show *no pattern of adverse treatment* of pregnant Retail Employees in terms of FMLA denials or discipline. The data suggest that pregnant Retail Employees are treated better than others.

## II.   PLAINTIFFS' CLAIMS AND DR. MADDEN'S OPINIONS

Cynthia Allen and Kristine Webb ("Plaintiffs") allege that AT&T treats Retail Employees[2] "whose absences for pregnancy, childbirth, or related medical conditions"[3] were not excused under the Sales Attendance Guidelines ("SAG") differently than other employees "not so affected but similar in their ability or inability to work . . ." 42 U.S.C. § 2000e(k). The Class Period is April 26, 2017 to the present. (Pls.' Second Am. Compl. (Dkt No. 50), ¶ 72.)

Plaintiffs argue that (a) "*pregnant* [Retail Employees] receive denials of requests for excused absences much more frequently *than others who seek excused absences under the SAG . . .*," and (b) "*pregnant* [Retail Employees] have more discipline imposed on them as compared to other workers." (Pls.' Mem. at 27

---

[2] "Retail Employees" refers to the non-exempt, non-management, bargained-for employees who held Relevant Jobs at AT&T during the Class Period and in the United States. "Relevant Jobs" include the Retail Sales Consultant and Sales Support Representative positions, which are retail positions in AT&T's company-owned retail stores.

[3] Second Am. Compl. (Dkt No. 50), ¶ 72.

(emphasis added).[4]) Their only support for these arguments is Dr. Madden's Reports, specifically three opinions:

1. <u>Madden Opinion One:</u> Pregnant Retail Employees "were less likely to be granted their requests for excused absences than were non-pregnant" Retail Employees.

2. <u>Madden Opinion Two:</u> Pregnant Retail Employees "were more likely to be subject to each pre-termination stage . . . in the disciplinary progression than were non-pregnant" Retail Employees.

3. <u>Madden Opinion Three:</u> When Retail Employees "became pregnant, they were more likely to be subject to attendance discipline . . . than they were before they were pregnant."

(Madden Rep. at 3, Madden Supp. Rep. at 2.) None of these opinions is admissible under Rule 702.

## III.   ARGUMENT

Statistical evidence, like any expert proof, cannot be accepted uncritically at any time, including at the class certification inquiry. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 36–38 (2013); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011) (*Daubert* critique was required for expert's testimony

---

[4] Plaintiffs' Memorandum in Support of their Motion for Class Certification, filed September 14, 2010, is cited as "Pls.' Mem.". Defendant's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, filed in tandem with this brief, is cited as "Def.'s Mem.".

critical to class certification); *see also In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 683 (N.D. Ga. 2016) ("Because this expert testimony is both challenged and critical to class certification, the Court cannot grant certification without first engaging in the analysis required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).") (citing *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014)).

"The Supreme Court has cautioned that statistics 'come in [an] infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.' Cautioning against the use of data that may have been 'segmented and particularized and fashioned to obtain a desired result,' courts focus on the probative value of the statistics presented. *Only statistics regarding the plaintiff's protected group, similarly situated comparators, and the employment practice at issue are relevant*."[5]

For the reasons set forth below, Dr. Madden's opinions should be excluded.

---

[5] BARBARA T. LINDEMANN, PAUL GROSSMAN & GEOFF WEIRICH, EMPLOYMENT DISCRIMINATION LAW, Ch. 35, at 35.II (6th ed.) (internal citations omitted). *See also Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998) (finding that for data to have meaning in an employment discrimination suit, they must have "sufficient depth, specificity and probative value"); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1363–64 (N.D. Ga. 2000) (permitting statistical analyses only where it was "designed to be relevant to the issues before the fact-finder").

### A.   Dr. Madden Does Not Properly Compare AT&T's Alleged Treatment of the Putative Class to Similarly Situated Workers.

Dr. Madden explicitly suggests that her analysis shows that pregnancy *is* a factor in AT&T's application of the SAG.[6]  These opinions are grossly misleading and not supported by her analysis.

Statistical comparisons are a generally accepted tool in discrimination cases. They need to do two things, however: (1) properly identify the protected group and (2) analyze the specific employment practice at issue, accounting for nondiscriminatory factors.[7] Fundamentally, the statistics here should compare AT&T's application of the SAG to "the complainant's protected group . . . with the corresponding [treatment of] the majority group."[8] The obvious purpose of the comparison is to evaluate whether the *protected characteristic* may be a factor in different outcomes between the protected group and the majority group.[9] Here, the putative class is *Retail Employees* who were *pregnant* from *April 26, 2017*

---

[6] *See* Madden Rep. at 3 (the "principal result[] of [her] analyses" is that "*pregnant workers* were less likely [than non-pregnant workers] to be granted their requests for excused absences . . . and *[p]regnant workers* were more likely [than non-pregnant workers] to be subject to each pre-termination stage [in the attendance discipline process]" (emphasis added); Madden Rep. at 12 (the odds that the difference she observed in FMLA treatment "occurred by chance *were pregnancy not a factor* are much smaller than one in a billion") (emphasis added).

[7] EMPLOYMENT DISCRIMINATION LAW, Ch. 35, at 35.III.B.

[8] *Id.*; *see also Cooper v. Southern Co.*, 260 F. Supp. 2d 1305, 1314-15 (N.D. Ga. 2003), *aff'd*, 390 F.3d 695 (11th Cir. 2004) (holding that where plaintiff's statistics—*proffered by Dr. Madden*—failed to compare similarly situated individuals, the probative value of any disparity was significantly diminished).

[9] *Id.*; *see also Hawkins v. Ceco Corp.*, 883 F.2d 977, 985 (11th Cir. 1989).

*forward*. The comparator (or majority) group includes non-pregnant Retail

Employees who were "similar [to pregnant workers] in their ability or inability to

work . . ." 42 U.S.C. § 2000e(k). Moreover, "[t]o be admissible and probative,

statistical analyses must [also] account for relevant, nondiscriminatory factors in

the employer's decision-making process."[10] Dr. Madden failed to do this too.

   Neither the protected group nor the majority group were properly defined by

Dr. Madden in her analysis. She failed to account for nondiscriminatory factors.

When appropriate comparisons are made, there is no pattern of denied absences,

denied excuses, or more discipline for pregnant Retail Employees. (Thornton Rep.

at 7, ¶ 19.[11])

   1.   Dr. Madden concedes that she erred by analyzing events when
        workers were not in Relevant Jobs and subject to the SAG.

   "[W]e should have used a screen that looked at whether they were in the

relevant job[s]," Dr. Madden acknowledged; if a worker was not in a relevant job

then she or he should not have been included in her analysis. (Madden Dep. at

_____

[10] EMPLOYMENT DISCRIMINATION LAW, Ch. 35, at 35.III.B. *See also Brown v. Bibb Cty. Props., LLC*, 602 F. App'x. 755, 758 (11th Cir. 2015) (finding plaintiff's statistical evidence insufficient to raise an inference of pretext where it failed to show that the data reflected was not the result of nondiscriminatory factors); *Toth v. McDonnell Douglas Aerospace Servs. Co.*, 31 F. Supp. 2d 1347, 1354 (M.D. Fla. 1998) (finding plaintiff's statistical evidence insufficient to raise an inference of discrimination or pretext because it failed to compare similarly situated individuals and failed to eliminate nondiscriminatory reasons for the numerical disparities).
[11] Rebuttal Report of Janet R. Thornton, Ph.D. dated March 31, 2021 is attached hereto as Exhibit 1 and cited herein as "Thornton Rep.".

105:10–106:14.[12]) She "hope[d] that [she] didn't include them," she later explained. (Madden Dep. at 122:19–123:6.) But she did.

Approximately 22% of the approximately 39,000 workers for whom Dr. Madden had data worked in a non-relevant job at some point between January 2015 and the present. (Thornton Rep. at 41, ¶ 78.) And excluding those periods of non-relevant employment from the analysis affects the statistical outcomes. (*See* discussion at section III.B., below.)

> 2.    Dr. Madden's opinions are inadmissible because her analysis did not focus on Retail Employees' Pregnancy Periods.

In addition to including time when workers were not subject to the SAG, Dr. Madden failed to focus on *periods when the Retail Employees were pregnant*.[13]

Instead of comparing AT&T's application of the SAG to *pregnant* Retail Employees with AT&T's treatment of *non-pregnant* Retail Employees during the Class Period, Dr. Madden did something else. She examined AT&T's treatment of "ever-pregnant" workers[14] from January 2015 forward. (Madden Dep. at 268:15–25.) None of Dr. Madden's comparisons with other workers shown in Tables 1a,

---

[12] Excerpts of the Deposition of Janice Madden, Ph.D. dated Oct. 20-21, 2020, and March 1, 2021 is attached hereto as Exhibit 2 and cited herein as "Madden Dep."

[13] Dr. Madden defined the periods of pregnancy from the available data (the "Pregnancy Periods") and could have tested whether pregnancy was a factor in FMLA denials and attendance discipline. (Madden Rep. at 8.)

[14] Dr. Madden refers to these individuals as "ever-pregnant." This reflects the obviously flawed assumption that if a worker was *ever* pregnant during her employment then everything occurring during her employment was pregnancy-related, regardless of when that event occurred.

2a and 3, distinguish between events occurring inside and outside the Pregnancy Periods. All such events are counted as AT&T's treatment of the ever-pregnant workers, regardless of the number of those events that occurred outside the Pregnancy Periods.

Dr. Madden's Opinion One (*pregnant* workers are less likely to be granted excused absences) and Opinion Two (*pregnant* workers are more likely to be disciplined) derive from her Tables 1a and 2a, respectively. These opinions depend on the fiction that events from outside the Pregnancy Periods are *pregnancy-related*.[15] She has no good explanation for this; in fact, she denies it in deposition. Why did she count FMLA denials outside the Pregnancy Period as pregnancy-related? "Nothing is counted as a pregnancy-related request," she said.[16] (Madden Dep. at 138–139.) If it was not counted as pregnancy-related, her results by definition cannot support an inference of pregnancy discrimination.

---

[15] *See* Madden Dep. at 139:8–19 (discussing her inclusion of events from outside the Pregnancy Period in Table 1a); Madden Rep. at 14 n.13 (discussing same, with respect to Table 2a). *See also* Thornton Rep. at 20–21, ¶ 46 (critiquing both).

[16] Dr. Madden has been criticized in other cases for shifting positions. "What I want to know is whether or not Dr. Madden believes something to be true," one court wrote. "If she says or writes one thing but then refuses to agree with it, only acknowledges that she did utter an opinion, and declines to answer further, the end results is that I'm not sure what to take as Dr. Madden's definitive opinion and argument." *OFCCP v. Oracle Am., Inc.*, No. 2017-OFC-00006, 2020 WL 6112340, ALJ's Recommended Decision, at p. 178 (Dep't of Labor Sept. 22, 2020).

Her discordant approach to analysis was "conservative," she insisted. By "including [the ever-pregnant employee's] whole history," she argued, "we're *counting the period where there is no discrimination* as part of her treatment effectively as a pregnant worker, so . . . it waters down that difference." (Madden Dep. at 139:8–140:25.) She is wrong. It does not water *down* the difference. Including the period outside of pregnancy gets her the results Plaintiffs wanted.

As Dr. Thornton's report shows, Dr. Madden's ever-pregnant workers *do not* have a statistically significantly higher rate of FMLA denials when the pre-pregnancy and post-pregnancy requests are excluded. (Thornton Report at 3–4, ¶ 13.) They have statistically significantly *lower* denial rates relative to each of Dr. Madden's comparison groups. (Thornton Report at 6, ¶ 18.B.) The denial rate for the ever-pregnant workers is statistically significantly higher *during the pre-pregnancy period*. (Thornton Report at 6, ¶ 18.C.2., 24–25, ¶¶ 52–54, Table 2.)

Dr. Madden assumed the existence of discrimination during pregnancy. She used the higher rate of FMLA denials *outside of the Pregnancy Period* to create statistical results that provided facial support for Plaintiffs' position. Ultimately, however, her analysis in Tables 1a and 2a has zero utility to the Court because it does not compare outcomes for *pregnant* Retail Employees with outcomes for non-pregnant Retail Employees.

9

Dr. Madden's Tables 1b and 2b are no better. Tables 1b and 2b do not even purport to analyze AT&T's treatment of non-pregnant Retail Employees similar in their inability to work. Instead, those tables purport to compare AT&T's treatment of ever-pregnant workers at different periods of their employment.[17] At best those tables provide Plaintiffs' a thin reed for the theory that pregnant workers may have been treated differently before their pregnancies than after. But that fails to account for how AT&T treated all other non-pregnant Retail Employees similar in their inability to work. Moreover, as shown in section III.A.7 below, the analysis shown in Tables 1b and 2b also fail to account for nondiscriminatory factors.

3.    Dr. Madden's Opinions One and Two are inadmissible because her analysis ignored excuses available under the SAG.

Dr. Madden's Opinions One and Two ignore the evidence showing how pregnancy-related absences are excused under the SAG, despite the fact that Plaintiffs' allegations are focused on the SAG.

The SAG is agnostic to health conditions and offers multiple excuses to pregnant workers, contrary to Dr. Madden's report (Madden Rep. at 9 ("SAG policy did not excuse absences due to pregnancy.")) Those excuses include:

---

[17] Madden Rep. at 13 ("Table 1b compares the rates of denial of requests for excused absences pregnant workers experienced during their pregnancy, or after they become pregnant, *with their own denial rates* when they were not pregnant."); Madden Supp. Rep. at 8 ("Table 2b compares the discipline pregnant workers experienced during their pregnancy, or after they become pregnant, *with their own discipline records* when they were not pregnant.") (emphasis added).

10

Approved Short-Term Disability, Approved Job Accommodations, and Federal/State/Municipal mandated leaves (*i.e.*, FMLA, ADAAA, etc.), among others. Dr. Madden was aware that these options existed under the SAG,[18] and had the relevant evidence of them available in the record to review.[19] Dr. Madden ignored evidence reflecting FMLA, Short Term Disability and Job Accommodation excuses are available to pregnant Retail Employees. (Thornton Rep. at 7–9, ¶¶ 22–24.) She testified that she knew nothing about Plaintiffs' own experiences, which illustrate that they too were aware that SAG excuses were available for pregnancy-related absences.[20] As shown in Dr. Thornton's Report, 96.1% of ever-pregnant Retail Employees successfully obtained excuses across multiple SAG categories. (Thornton Rep. at 9–10, Figure 1, ¶ 25–26.)

Given this, Dr. Madden's opinion about FMLA denials does not account for the facts of this case, much less lead to an inference that *application of the SAG* disadvantages pregnant Retail Employees.[21] At most, Dr. Madden purports to give an opinion regarding AT&T's application of FMLA rules to people who *at some point* were pregnant, not how they were treated *under the SAG while pregnant*.

---

[18] *See* Madden Rep. at 6 (detailing the list of excuses available under the SAG).
[19] *See* Def.'s Mem. at sections II.B and II.D.
[20] *See, e.g.*, Madden Dep. at 52:24–55:19.
[21] *Schaw v. Habitat for Humanity of Citrus Cty., Inc.*, 938 F.3d 1259, 1274 (11th Cir. 2019) ("It's not enough to show that a few people are affected by a policy—rather, the disparity must be substantial enough to raise an inference of causation.")

4.    <u>Dr. Madden's Opinion Three is inadmissible because her
analysis ignores the progressive nature of SAG discipline.</u>

Dr. Madden's Opinion Three is grossly misleading. Her analysis ignores

evidence that the SAG's progressive nature affect all employees similarly. Instead,

she relies on her own groundless assumptions about worker behavior to suggest

that ever-pregnant employees are treated differently.

Dr. Madden's Table 2b purportedly demonstrates that ever-pregnant workers

are more likely to receive attendance discipline during and after pregnancy than

before. To reach her opinion, Dr. Madden counted discipline as pregnancy-related

even if it occurred *as much as four years after pregnancy ended*. (Madden Dep. at

239:2–240:22.) More fundamentally, however, she failed to compare her results for

ever-pregnant workers to the experience of other workers.

First, Dr. Madden tries to obfuscate what is intuitively logical—*i.e.* the

incidents of SAG discipline increase over time for Retail Employees as they have

greater opportunities for absences (referred to as "Exposure").[22] She suggests in

her Report that the opposite is true, saying that "[d]iscipline is generally expected

---

[22] Dr. Madden's conclusion in Table 2b is further undermined because she ignores
the truncated nature of the data that go back to January 1, 2015, the beginning of
the period she studied. As described by Dr. Thornton, as a result of AT&T's
change to a new electronic platform the discipline data through 2015 and early
2016 (outside the Class Period) reflected very few disciplinary actions. (Thornton
Rep. at 32–34, ¶¶ 64–65, Table 11.) Indeed, the first few months of 2015 show no
discipline at all, and the number of disciplinary actions did not exceed 2,000 until
May 2016. (*Id.*) Naturally, this would lead to an increase in the number of
disciplinary events over time across the period Dr. Madden studied.

to be more likely when workers are earlier in their employment than later in their employment." (Madden Supp. Rep., at 11 n.10; Madden Dep. at 279:20–281:3.) She cites no authority for this statement, and the data are to the contrary. When asked in her deposition, she changed her position.

The average length of time to a Retail Employee's first disciplinary action is 2.5 years and among Dr. Madden's ever-pregnant Retail employees it is even longer, 2.9 years. (Thornton Rep. at 35, ¶ 69.) In her deposition, Dr. Madden agreed that "the passage of time, by definition increases the opportunity for people to be out of work without an excuse." (Madden Dep. at 287:14–18.) She testified: "a progressive discipline system is obviously going to increase the discipline over time for the worker" (Madden Dep. at 296:7–10); "by definition its designed as a system that regardless of whether behavior changes over time, the discipline increases over time because it echoes through the worker's career." (Madden Dep. 296:20–24.) Still, her Reports suggest that something is amiss when the data show that later in time, ever-pregnant workers have more discipline than earlier in time.

Second, Dr. Madden conceded that the conclusions she draws from her Table 2b would be undermined if the differences for men over time were at least as large as those of her ever-pregnant women. (Madden Dep. at 303:7–20.) Yet, she did no such comparison, as one intuitively would do to test whether pregnancy was a factor in the application of SAG discipline.

Dr. Thornton tested whether the effect shown in Dr. Madden's Table 2b for ever-pregnant workers occurs for others. It does—as logic suggests. Dr. Thornton prepared a statistical test on male and non-pregnant female Retail Employees. (Thornton Rep. at 37–38, ¶¶ 72–73.) She used the average proportions of time from Dr. Madden's pre-pregnancy, during-pregnancy and post-pregnancy periods for the ever-pregnant population, and replicated the analysis shown in Dr. Madden's Table 2b for the men and non-pregnant women. (Thornton Rep. at 38, ¶ 73.) "The during/post-pregnancy period has the same direction for the male and non-pregnant females as the ever-pregnant women," Dr. Thornton explains, "which is consistent with the progressive discipline system, that is, *with time we expect more disciplinary action*." (Thornton Rep. at 38–40, ¶ 74, Tables 12, 13 and 14 (emphasis added).) In fact, the increase in discipline over time is actually *greater* for male and non-pregnant female workers, as shown in Dr. Thornton's Tables 13, 14 and 15. (Thornton Rep. at 39–40, Tables 13, 14 and at 51, Table 15.)

5.   <u>Dr. Madden's analysis goes outside the Class Period.</u>

Dr. Madden also failed to focus her analysis on the Class Period. She instead examined events from January 2015 forward, despite the fact that the Class Period runs from April 26, 2017. (Madden Dep. at 268:15–25.) Her explanation for this was no better than her excuses for not analyzing AT&T's treatment of pregnant Retail Employees. "I don't go mining complaints to figure out what to do," Dr.

Madden explained at her deposition, acknowledging that she let Plaintiffs' counsel define the period of time for analysis. (Madden Dep. at 101:2–25).[23]

Using more than two additional years of observations, by definition, increased the likelihood that any differences she found between the groups she analyzed (which as shown above were incorrect) would rise to the level of statistical significance. The scientific literature cautions against this: "'[t]he mere existence of a large t-score for a huge sample has no real substantive significance because if the sample size is large enough, you can reject almost any null hypothesis!' meaning that the results will be statistically significant." (Thornton Rep. at 20–21, ¶¶ 44–45.)

Asked whether conducting her analysis only on events during the Class Period would affect the outcomes, Dr. Madden speculated, "[i]t's hard to imagine substantively they would be any different because the significance is so huge, but don't know until I conduct the analysis." (Madden Dep. at 102:1–14.) As shown in

---

[23] Courts may permit analyses that go beyond the class period when an expert provides a reasonable scientific explanation for doing so. *See, e.g.*, *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282 (11th Cir. 2011) (permitting expert to evaluate defendant's pre-class period stock price where expert deemed such analyses relevant to the determination of loss causation and damages); *Zucco Partners, LLC v. FindWhat.com*, No. 2:05-cv-2001-Ftm-29DNF, 2008 WL 6154169 (M.D. Fla. Nov. 3, 2008). Dr. Madden had no such explanation.

15

section III.B., it makes a difference.[24] Results favorable to the pregnant workers

over the longer period are more favorable when the Class Period is studied.

6.   <u>Dr. Madden does not properly apply scientific methods.</u>

Expert opinion must rest on a reliable (*i.e.*, scientifically valid) method. The

expert must then also *apply* that method reliably to the facts of the case. Fed. R.

Evid. 702(d); *United States v. Frazier*, 387 F.3d 1244, 1261–63 (11th Cir. 2004).

Dr. Madden fails to do this; she misuses the t-Test (a test of averages) to reach the

results supporting her opinions.

As one resource states, a t-Test "is easy to misuse; t-scores are so frequently

printed out by computer regression packages and the t-Test seems so easy to work

with that beginning researchers sometimes attempt to use the t-Test to 'prove'

things that it was never intended to even test."[25] Dr. Thornton explains why. The t-

Test is designed for data that have a continuum of potential outcomes across a

sample, such as salary data; it is a comparison of group averages. The assumption

underlying the t-Test is that the values are drawn from a normal distribution along

that continuum—that is, the curve of distributed values for one group is being

compared to the curve of distributed values for the other group. The investigator

can see whether the two populations have sufficiently different distributions to

---

[24] *See also* Thornton Rep. at 51–52, Tables 15–18, and at 54–56, Tables 19–22.
[25] Thornton Rep. at 22, ¶ 49, n.58 (quoting, Studenmund, A.H. & Cassidy, H.J. (1987) *Using Econometrics: A Practical Guide*. Boston, MA: Little, Brown and Company, pages 106-109.)

warrant a probabilistic conclusion that one group is being treated differently than the other. (Thornton Rep. at 21–23, ¶¶ 46–49.)

Dr. Madden relies on the t-Test for the analysis reflected in her Tables 1a, 1b and 2a. In each instance, this is an improper use of the t-Test because there are only two possible outcomes—*i.e.* FMLA was granted or denied and discipline was or was not imposed. (Thornton Rep. at 21–23, ¶¶ 47–49.) Oddly, Dr. Madden used a different test, a probit model for the analysis behind her Table 2b, which similarly evaluates the possibility of two outcomes. (Madden Rep. at 12–13.)

Dr. Madden first insisted in her deposition that the unit of analysis for her Table 1a was the FMLA request,[26] acknowledging that one worker may request 10 days and another worker may request 20 days. (Madden Dep. at 142:24–143:13.)[27] If she were correct, then the t-Test would have been the appropriate tool, as described below. But she was wrong.

The next day, Dr. Madden clarified that her actual unit of analysis was the day. (Madden Dep. at 191:17–192:13, 210:24–211:2.) That means that she counted daily denials and approvals without linking them to the request, which fails to account for the reality that the days sought within a request are tied to the worker's

---

[26] If the unit of analysis is the request and an employee made one request for 5 days prior to pregnancy but was denied 3 FMLA days, and another request during pregnancy for 20 days but was denied 8 FMLA days, the *pre-pregnancy* request was 60% denied and the *during pregnancy* request was 40% denied.
[27] Dr. Madden admitted, however, that she failed even to look at the Plaintiffs' own records. (Madden Dep. at 144:4–8.)

submission of documents associated with that request. (Thornton Rep. at 15–17, ¶¶ 35–39.) As a consequence, her use of the t-Test was improper.

A t-Test can be used properly if the unit for analysis of FMLA denials is the worker's FMLA *request*. Plaintiffs' own experience shows that FMLA requests often are for multiple days. For example, Ms. Allen submitted one FMLA request to cover 29 absence days in 2016. Only about half of those absence days were approved and excused under FMLA.[28] By analyzing the percentage of days that are denied *by request* the investigator can see a continuum of values across the two populations as shown below.



---

[28] For further detail, *see* Thornton Rep. at 15–16, ¶ 27.

(Thornton Rep. at 22–23, ¶ 49, Figure 3—Distribution of Percentage of Days Denied by FMLA Request of Ever-Pregnant Compared to Non-Pregnant Workers.)

By using the day as the unit of analysis, Dr. Madden averaged zeros and ones for her ever-pregnant population and compared that to the averages of the zeros and ones for her comparator groups.[29] (Thornton Rep. at 20–21, ¶¶ 46–48.) She similarly misapplied the t-Test to her discipline analysis shown in Table 2a. (Thornton Rep. at 43, ¶ 82.) Asked if the t-Test is the appropriate technique for that analysis, Dr. Madden said, "I think it's fine. There are other tests." (Madden Dep. at 308:8–12.) Then she equivocated as to whether it was an appropriate test under the circumstances, saying "[i]t's a reasonable test to use. You're not going to get a different result using a different test. . . . If you wanted to use another test, that's fine with me. They will yield the same result," she speculated (*Id*. at 309:14–20.)

### 7. Dr. Madden did not account for relevant nondiscriminatory factors that affect FMLA denials and attendance discipline.

Dr. Madden acknowledged that she failed to investigate issues of FMLA eligibility and exhaustion, two nondiscriminatory factors that affect FMLA denials. She also failed to account for whether workers even requested excuses for

---

[29] Described differently, using her approach each observation (each day) is either 100% or 0% denied. So, using the example from footnote 12 above (25 total days requested, 11 denied), if the unit of analysis was the day the overall denial rate for that person is 44%.

absences that may have resulted in discipline.[30] Her opinions are, therefore, not grounded in the facts of this case, *as an expert's opinions should be*, and her conclusions therefore cannot be relied upon by the Court.[31]

> a. FMLA eligibility and exhaustion rules apply to all workers.

AT&T's FMLA eligibility and exhaustion rules apply equally to all Retail Employees.[32] So any analysis of FMLA denials should account for that.[33] Dr. Madden did not do this, however, despite acknowledging that part-time employees are less likely to be eligible for FMLA and that women are more likely to work part-time. (Madden Dep. at 193:23–25, 208:17–21.)

FMLA eligibility and exhaustion rules account for large portions of the FMLA denials she studied. (Thornton Rep. at 13–14, ¶ 33, Figure 2.) Even more significantly, "a disproportionate number have a reason of Ineligible *among [Dr. Madden's] ever-pregnant workers compared to all others*." (*Id.*) Nearly 70% of the ever-pregnant workers were denied FMLA because of ineligibility or exhaustion, compared to 53% of the overall Retail Employee population. (*Id.*) Dr. Madden

---

[30] *See* Thornton Rep. at 11–13, ¶¶ 28–33.

[31] *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004) ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts.").

[32] *See* Def.'s Mem. at section II.D.1.

[33] *See Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1351 (M.D. Ga. 2007), *aff'd*, 300 F. App'x 700 (11th Cir. 2008) (excluding expert testimony where expert did not account for alternative explanations for plaintiff's injury); *Magbegor v. Triplette*, 212 F. Supp. 3d 1317, 1328 (N.D. Ga. 2016) (same).

ignored this and instead uncritically "assumed that pregnant workers and nonpregnant workers were similarly situated" with respect to eligibility and exhaustion. (Madden Dep. at 152:8–18.)

> b.   Not all workers seek excuses for absences.

Attendance discipline under the SAG results from points, and points result when Retail Employees fail to report for work as scheduled. Points are avoided only if an employee seeks and is granted an excuse. Dr. Madden acknowledges that workers may make different choices, even when faced with the same incentives or disincentives. (Madden Dep. at 63:12–24.) She acknowledges that discipline in any case may be the result of the employee's decision and not AT&T's denial of an excuse request. (Madden Dep. at 79:6–80:19.) That is true even for Plaintiff Webb, for example, who received attendance points for absences apparently unrelated to her FMLA requests. (Thornton Report at 42, ¶ 80.)

Nor is this surprising, given the evidence in this case. Dr. Madden concedes that termination of employment is rare under the SAG, equally rare for ever-pregnant workers and others. (Madden Dep. at 283:14–19; Madden Supp. Rep. at 3, 15–16.) The Counseling, Written Warning and Final Written Warning are escalating reminders to employees that attendance is an essential function of the job. While attendance discipline *may* impact promotion or transfer,[34] Dr. Madden

---

[34] *See* Def.'s Mem. at 31, n.94.

never investigated whether it does, even for her ever-pregnant workers. (Madden Dep. at 237:13–238:19.) As shown in Figure 5 of Dr. Thornton's report, however, the data show that her ever-pregnant workers generally were more likely to receive a pay increase and a promotion or transfer within a year of discipline than others. (Thornton Rep. at 44–46, ¶¶ 84–86, Figure 5.)

Despite all of this, Dr. Madden's analysis of discipline fails to account for the reality that workers sometimes accept points and discipline without ever requesting excuses. Her analysis includes Retail Employees who never had an absence and/or never requested a medical or medical related excuse, and she even includes people whose only absences were vacation. (Madden Dep. 311:13–312:2; Thornton Rep. at 41–42, 47, ¶¶ 78–79, 89.)

## B.   There is a pattern of favorable treatment for Dr. Madden's ever-pregnant workers.

When Dr. Madden's errors are just *partially corrected*, the data do not show a pattern of adverse treatment for her ever-pregnant workers.[35] Indeed, the data show that this population generally received more favorable treatment in FMLA denials and in attendance discipline.

### 1.   Ever-pregnant workers generally had fewer FMLA denials.

---

[35] As more thoroughly explained in her Rebuttal Report, Dr. Thornton's replication of Dr. Madden's work corrected for errors that Dr. Madden herself conceded or that Dr. Madden could not seriously dispute.

Dr. Thornton replicated Dr. Madden's Tables 1a and 1b and corrected some of her errors. This shows that ever-pregnant Retail Employees had (a) *fewer* FMLA denials than other Retail Employees, and (b) *fewer* FMLA denials during and after pregnancy than before. (Thornton Rep. at 26–32, ¶¶ 55–63.)

Dr. Thornton used Dr. Madden's data files and definition of ever-pregnant workers, and she changed the following:

1. She used the *request* as the unit of analysis, instead of the *day*;

2. She removed absences when the worker was not in a Relevant Job; and

3. She removed workers who were not employed by AT&T before becoming pregnant and therefore had no pre-pregnancy period, as Dr. Madden said was appropriate. (Thornton Rep. 26, ¶ 56.)

Dr. Thornton's Tables 3-4 show the corrected results for Dr. Madden's Table 1a analysis. For example, among all FMLA requests, ever-pregnant Retail Employees had a denial rate of 33% compared to 40% among non-pregnant Retail Employees; this difference is statistically significant at nearly 12 standard deviations. The results are even more favorable for the Class Period (Tables 5 and 6)—a denial rate of 29% for ever-pregnant Retail employees compared to a 44% denial rate for non-pregnant Retail Employees, a difference that is statistically significant at over 16 standard deviations. Dr. Thornton's Tables 7-8 show the

23

corrected results for Dr. Madden's Table 1b analysis, consistently showing that lower FMLA denial rates during/post pregnancy. Her Tables 9-10 show the corrected results for the Class Period, also generally showing lower FMLA denial rates during/post pregnancy. (Thornton Rep. 28–31.)

2.   Ever-pregnant workers generally had less discipline.

Dr. Thornton replicated Dr, Madden's Tables 2a and 2b, correcting only some of her errors. This shows ever-pregnant Retail Employees had (a) *less* discipline than other Retail Employees, and (b) *less* discipline during pregnancy than before. (Thornton Rep. at 47–56, ¶¶ 90–104.)

Dr. Thornton used Dr. Madden's data files and her definition of ever-pregnant Retail Employees and changed the following:

1. She excluded workers who likely did not seek an excuse and instead accepted discipline;

2. She removed disciplinary action occurring when the worker was not in a Relevant Job;

3. She included Exposure as a control measure to account for the progressive nature of discipline;

4. She removed discipline of ever-pregnant workers that occurred one year or more after the pregnancy; and

5.  She used a probit model because it is the appropriate statistical technique when there are two possible outcomes.

Dr. Thornton's Tables 15-18 (Thornton Rep. at 51–52) show the corrected results for Dr. Madden's Table 2a analysis. For example, from January 2015 forward, 91% of ever-pregnant Retail Employees received some form of discipline compared to 100% of non-pregnant Retail employees, and this difference is statistically significantly favorable to ever-pregnant Retail Employees at over 20 standard deviations. The results are even more favorable for the Class Period— 64% of ever-pregnant Retail Employees received some form of discipline compared to 87% of non-pregnant Retail Employees, a difference that is statistically significant at nearly 25 standard deviations. Tables 19 through 22 (Thornton Rep. 54–56) show the corrected results for Dr. Madden's Table 2b analysis for the period from January 2015 forward and for the Class Period. These tables illustrate that ever-pregnant Retail employees generally were disciplined less during and after pregnancy.

## IV.   CONCLUSION

For the reasons described above, Dr. Madden's Report should be excluded in its entirety as inadmissible.

Dated:  March 31, 2021

Respectfully submitted,

By:  _____

Kenneth W. Gage (*pro hac vice*)
Paul Hastings LLP
200 Park Avenue, 30th Floor
New York, NY  10166
(212) 318-6046
kennethgage@paulhastings.com

Christine L. Cedar (*pro hac vice*)
Paul Hastings LLP
2050 M Street N.W.
Washington, D.C. 20036
Tel: (202) 551-1700
christinecedar@paulhastings.com

Sheldon W. Snipe
AVP Senior Legal Counsel
AT&T Services, Inc.
675 West Peachtree Street, NW
Suite 4300
Atlanta, Georgia 30308
Tel: (404) 893-7953
ss5526@att.com

*Attorneys for AT&T Mobility Services
LLC*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to LR 5.1B and 7.1D of the Northern District of

Georgia, that the foregoing DEFENDANT'S MOTION TO EXCLUDE

THE OPINIONS OF JANICE F. MADDEN, Ph.D. AND MEMORANDUM OF

LAW IN SUPPORT complies with the font and point selections approved by the

Court in LR 5.1B. The foregoing pleading was prepared on a computer using 14-

point Times New Roman font.

 

 

_____

Kenneth W. Gage (*pro hac vice*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| _____ ) | |
| CYNTHIA ALLEN and KRISTINE ) | |
| WEBB, ) | |
| ) | |
| Plaintiffs, ) | Civil No. 1:18-cv-3730-WMR |
| v. ) | |
| ) | |
| AT&T MOBILITY SERVICES LLC, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 31st day of March, 2021, I have electronically filed the foregoing DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF JANICE F. MADDEN, Ph.D. AND MEMORANDUM OF LAW IN SUPPORT with the Clerk of the Court using the CM/ECF System, which will automatically send e-mail notification of such filing to the following attorneys of record:

> Joseph M. Sellers (*pro hac vice*)
> Kalpana Kotagal (*pro hac vice*)
> Harini Srinivasan (*pro hac vice*)
> Cohen Milstein Sellers & Toll PLLC
> 1100 New York Avenue, Suite 500
> Washington, D.C. 20005
> kkotagal@cohenmilstein.com

1

jsellers@cohenmilstein.com
hsrinivasan@cohenmilstein.com

Gillian L. Thomas (*pro hac vice*)
American Civil Liberties Union Foundation-NY
125 Broad Street, 18th Floor
New York, New York 10004
gthomas@aclu.org

Sean Young
American Civil Liberties Union Foundation of Georgia, Inc.
P.O. Box 77208
1100 Spring Street, N.W.
Suite 640
Atlanta, Georgia  30357
syoung@acluga.org

*Counsel for Plaintiffs Cynthia Allen and Kristine Webb*

Kenneth W. Gage (*pro hac vice*)