**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

CYNTHIA ALLEN and KRISTINE WEBB,

        Plaintiffs,

v.

AT&T MOBILITY SERVICES LLC
a/k/a AT&T MOBILITY LLC,

        Defendant.

Civil No. 1:18-cv-3730-WMR

**PLAINTIFFS' MOTION TO EXCLUDE
THE OPINIONS OF JANET R. THORNTON, PH.D. AND
<u>MEMORANDUM OF LAW IN SUPPORT</u>**

# TABLE OF CONTENTS

<u>Page</u>

I.    INTRODUCTION ........................................................................1

II.   ARGUMENT ...............................................................................3
      A.    The Standard for Admission of Expert Testimony ...............................3
      B.    Dr. Thornton Removes Nearly 70% of the Denials of Ever-Pregnant Workers' Excused-Absence Requests from the Analysis ..................................................................5
            1.    Dr. Thornton Removed Nearly 70% of Denials of Excused Absences of Ever-Pregnant Workers Arbitrarily .........7
            2.    Removal of All Denials of Requests for Excused Absences for FMLA Ineligibility or Exhaustion Introduced Bias .......................................................10
            3.    To Remove Denials for FMLA Ineligibility and Exhaustion, Dr. Thornton Used Highly Unreliable Variables ...................................................................11
      C.    Dr. Thornton Erroneously Calculated Approved Leave Requests, Dramatically Overstating Ever-Pregnant Workers' Access to Excused Absences.................................14
      E.    Dr. Thornton Re-Classified Known Pregnant Workers as Non-Pregnant, Skewing the Analysis.........................................15
      F.    In Seeking to Rebut Dr. Madden's Analysis of Attendance-Related Discipline, Dr. Thornton Selectively Deleted Discipline Records for Pregnant Women ..........................................17
      G.    To Analyze Attendance Related Discipline, Dr. Thornton Created an Unreliable Measure of Tenure and Exposure Reflected Tables 15–22 .....................................................18
      H.    Dr. Thornton's Analysis of Transfers and Promotions Reflected in in Figure 5 Must be Excluded Because it is Irrelevant ..................22

III.  CONCLUSION...........................................................................23

# TABLE OF AUTHORITIES

Page

CASES

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*,
  479 U.S. 272 (1987)..................................................................................7

*City of Tuscaloosa v. Harcros Chemicals, Inc.*,
  158 F.3d 548 (11th Cir. 1998) ..........................................................4, 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..............................................................................1, 4, 18

*Guillory v. Domtar Indus. Inc.*,
  95 F.3d 1320 (5th Cir. 1996) ..................................................................5

*Hudgens v. Bell Helicopters/Textron*,
  328 F.3d 1329 (11th Cir. 2003) ..............................................................4

*McCorvey v. Baxter Healthcare Corp.*,
  298 F.3d 1253 (11th Cir. 2002) ..............................................................4

*Palatka v. Savage Arms, Inc.*,
  No. 1:10-CV-626, 2012 WL 12887774 (W.D. Mich. Apr. 12,
  2012), *aff'd in part, rev'd in part and remanded*, 535 F. App'x 448
  (6th Cir. 2013)........................................................................................9

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ..........................................................5, 18

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir.
  2000) ......................................................................................................12

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ..............................................................4

*United States v. Jayyousi*,
  657 F.3d 1085 (11th Cir. 2011) ..............................................................4

# TABLE OF AUTHORITIES

<u>Page</u>

*Young v. United Parcel Serv., Inc.*,
  135 S. Ct. 1338 (2015).................................................................................10

**STATUTES**

42 U.S.C. § 2000e(k) ...................................................................................7

Americans with Disabilities Act .................................................................8

**OTHER AUTHORITIES**

U.S. Equal Employment Opportunity Commission, *Guidance: The
  Family and Medical Leave Act, the ADA, and Title VII of the Civil
  Rights Act of 1964* (Nov. 1, 1995). .......................................................8

123 Cong. Rec. 29,658 (1977) ...................................................................8

124 Cong. Rec. 38,574 (1978) ...................................................................7

Federal Rules of Evidence Rule 702..................................................1, 4

Encyclopedia of Research Design, *Control Variables* (2010)................19

## I.   <u>INTRODUCTION</u>

Plaintiffs move to exclude the report of and testimony by Dr. Janice R. Thornton, Ph.D., a statistician and economist offered by AT&T Mobility ("AT&T") to rebut the opinions of Plaintiffs' expert, Professor Janice F. Madden. Ph.D. Dr. Thornton's core opinions and testimony are inadmissible under Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dr. Thornton did not base her opinions on reliable data, did not use reliable principles or methods, and did not apply her methods reliably to the facts of this case. Her opinions will not be helpful to the trier of fact in this case and should be excluded.

Dr. Thornton has prepared a report, offered in rebuttal to the Report and Amended Supplemental Reports of Plaintiffs' labor economist expert Professor Janice F. Madden.  Dr. Madden has examined AT&T's absence, discipline, and other related workforce data and describing disparities adverse to pregnant workers, at levels that are highly statistically significant, in denials of requests for excused absences as well as attendance-related progressive discipline. With her Rebuttal Report, Dr. Thornton conducts statistical analyses that purport to demonstrate that AT&T's attendance policy does not treat pregnant workers worse than others similarly situated. She concludes that pregnant workers at AT&T are less likely to be denied an excused absence relative to other workers and have lower rates of

1

discipline compared to non-pregnant workers, and that "there is *not a pattern* of higher unexcused absences or disproportionately more disciplinary actions against ever-pregnant workers."[1] She also offers an analysis that purports to show that pregnant workers have favorable employment paths at AT&T in terms of promotions and transfers, as compared to non-pregnant workers.

However, these analyses and conclusions are the product of large-scale and baseless adjustments to and deletions of relevant data – most notably, her excision from the dataset of *nearly 70%* of the denials of excused-absence requests made by ever-pregnant workers.[2] There is no principled basis for the excision of this data, which reflects a deep misunderstanding of AT&T's attendance policies. The removal of these denials of excused absence requests distorts the analysis, operating like "a very heavy thumb . . . on the scale by removing selectively the denial or approval data on one group" to alter results that are highly statistically significant and adverse to ever-pregnant workers.[3] Dr. Thornton also adjusted the categorization of workers in a manner that "clearly biases" the outcomes for non-pregnant workers—for example, by re-assigning "ever-pregnant" workers as "non-pregnant"

---

[1] Rebuttal Report of Janet R. Thornton, Ph.D. ("Thornton Rebuttal Rep.") at 7, Dkt. 104-7.

[2] Thornton Rebuttal Rep. at 14 (Figure 2); Rebuttal Report of Dr. Janice Madden ("Madden Rebuttal Rep.") at 14, Ex. 49 to Pls.' Reply in Support of Mot. for Class Certification. The data for these denials is drawn from AT&T's LeaveLink/FMLA data. *See* Madden Rebuttal Rep. at 13–14, Ex. 49.

[3] Madden Rebuttal Rep. at 13, 33, Ex. 49.

workers.[4] Her analysis of promotions and transfers is misleading and irrelevant as it is limited to workers who have already experienced discipline and therefore does not account for the result that pregnant workers receive *more* discipline than others. Moreover, Dr. Thornton's failure to independently verify the data or the variables upon which she relied introduces significant unreliability.

As a result, Dr. Thornton's opinions and proffered testimony are not reliable, relevant, or helpful to a factfinder. Plaintiffs respectfully request that the Court exclude Dr. Thornton's Figures 1, 2, 5 and Tables 2–10, 15–22, and the related discussion in her Report of those Figures and Tables.[5]

## II.   <u>ARGUMENT</u>

### A.    The Standard for Admission of Expert Testimony

 Expert testimony is admissible only if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[4] *See id.* at 15. Ex. 49.

[5] *See* Proposed Order to Plaintiffs' Motion to Exclude the Opinions of Janet R. Thornton, Ph.D, attached as Ex. 1.

Fed. R. Evid. 702. Rule 702 and *Daubert* "compel[] the district courts to perform the 'gatekeeping' function concerning the admissibility of expert scientific evidence,"[6] by conducting "an exacting analysis" of the foundations of expert opinions.[7]

The Eleventh Circuit has established a three-part inquiry to determine whether the expert witness's opinions have met the standard for admissibility under Rule 702 and *Daubert*. "[D]istrict courts must consider whether [1] the expert can testify competently on the areas he intends to discuss, whether [2] the expert's methodology is sufficiently reliable, and whether [3] the expert's testimony, through the application of his scientific, technical, or specialized expertise, will assist the trier of fact to understand the evidence."[8] The purpose of the *Daubert* inquiry is, in short, to determine whether the expert is qualified, and the testimony is reliable and relevant such that it will assist the fact-finder understand the claims at issue.[9]

Although the *Daubert* inquiry is a "flexible one,"[10] certain factors – an expert's failure to connect her analysis to the claims at issue, usage of flawed variables, or reliance on fundamentally faulty methodology, for example – require

---

[6] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis omitted) (quoting *Daubert*, 509 U.S. at 589 n.7).

[7] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002); *see also Frazier*, 387 F.3d at 1260.

[8] *United States v. Jayyousi*, 657 F.3d 1085, 1106 (11th Cir. 2011) (citation omitted).

[9] *See, e.g.*, *Hudgens v. Bell Helicopters/Textron,* 328 F.3d 1329, 1338 (11th Cir. 2003).

[10] *See City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 n.16 (11th Cir. 1998) (internal quotation marks omitted).

exclusion.[11] Dr. Thornton's testimony falls short on each of these elements: Dr. Thornton relied on flawed variables, excised large amounts of relevant data from analysis, re-classified groups of pregnant workers as non-pregnant, and conducted other analyses that are unresponsive to Dr. Madden's results and Plaintiffs' claims.[12] These errors require exclusion of Figures 1, 2, 5 and Tables 2–10 and 15–22 of her Rebuttal Report as well as associated discussion of those Figures and Tables, as they are neither reliable nor do they "assist the trier of fact to understand or determine [the] fact[s] in issue."[13]

## B. Dr. Thornton Removes Nearly 70% of the Denials of Ever-Pregnant Workers' Excused-Absence Requests from the Analysis

Among the most serious flaws in Dr. Thornton's analysis is the removal of AT&T's denials of workers' requests for excused absences under the Family Medical and Leave Act ("FMLA") because the workers were either ineligible for

---

[11] *See, e.g., City of Tuscaloosa*, 158 F.3d at 566 (concluding that exclusion was required where the "methodology underlying a small portion" of an expert's "data and testimony" was "fundamentally flawed, and that the evidence based thereon [was] consequently unreliable"); *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (concluding the district court properly excluded expert testimony where the testimony was "not based upon the facts in the record but on altered facts and speculation designed to bolster" the defendant's position).

[12] Although Plaintiffs do not challenge the admission of Dr. Thornton's testimony on the basis of her qualifications, Plaintiffs note that Dr. Thornton has not published any articles in a peer-reviewed publication related to the economics of sex discrimination. *See* Thornton Rebuttal Rep., App'x A (Curriculum Vitae and Testimony List), Ex. 49.

[13] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

FMLA (having not worked full-time for one year at AT&T) or because they had exhausted their 12 weeks of annual allotted leave (such as to care for a sick child or other close family member). An expert report that purports to show that a given policy does not harm pregnant workers, and then deliberately excises some of the most damning evidence of that harm, is neither scientifically valid nor helpful to the factfinder.

Dr. Thornton's Rebuttal Report does not justify or support the removal of denials of requests for reasons of FMLA ineligibility or exhaustion.[14] She testified that she believed they should have been removed from Dr. Madden's analysis because those denials "are based on the FMLA guidelines themselves that are independent of AT&T Mobility. They're based on the rules of FMLA[.]"[15] But – as she later acknowledged – Plaintiffs' claims are not limited to workers who are eligible for or able to avail themselves of FMLA-mandated leave.[16] The Named Plaintiffs seek to represent a class of "pregnant workers"[17] who were absent due to pregnancy and sought to have those absences excused. It is AT&T that decided to shoehorn Plaintiffs into the FMLA leave scheme, making their success or failure in avoiding points profoundly dependent on that statute.

---

[14] *See* Thornton Rebuttal Rep. at 11–14.
[15] Deposition of Janet R. Thornton, Ph.D. (Apr. 20, 2021) ("Thornton Dep.") 142:17–20, attached as Ex. 2.
[16] *See id.* 143:16–19, Ex. 2.
[17] *Id.* 143:19, Ex. 2.

Not only was Dr. Thornton's decision substantively flawed but also procedurally, as she methodologically deleted these denials by relying on inaccurate variables in AT&T's workforce data and did not make any efforts to verify the accuracy of those variables before relying on them for a fundamental component of her report.

### 1. Dr. Thornton Removed Nearly 70% of Denials of Excused Absences of Ever-Pregnant Workers Arbitrarily

The removal of nearly 70% of denials of excused absences of ever-pregnant workers from her analysis of excused absences is more than shoddy analysis; it demonstrates that Dr. Thornton fundamentally failed to examine a core claim of the putative class – her only assignment – that FMLA eligibility is *not a pre-requisite* for an accommodation under the PDA. The PDA, which mandates that pregnant workers be treated "the same" as others "similar in their ability or inability to work,"[18] amended Title VII to assure pregnant workers were protected from the wide range of discriminatory practices outlawed under that statute, so that they would "be financially and legally protected before, during, and after [their] pregnancy."[19]

---

[18] 42 U.S.C. § 2000e(k).

[19] 124 Cong. Rec. 38,574 (1978). *See*, *e.g*., *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 289 (1987) (PDA was intended "to guarantee women the basic right to participate fully and equally in the workforce, without denying them the fundamental right to full participation in family life") (quoting 123 Cong. Rec. 29,658 (1977)).

The FMLA, while a landmark statute, is vastly more circumscribed. It protects the rights of certain categories of workers to take three months of job-protected leave a year, either for self-care (including pregnancy), care for a family member, or baby bonding. Its protections are dwarfed by those of the PDA. As the U.S. Equal Opportunity Commission explained more than two decades ago in its Guidance concerning the intersection of the PDA, the FMLA, and the Americans with Disabilities Act ("ADA"):

> Q:      Can a leave policy that complies with the FMLA violate Title VII?
>
> A:      Yes.  An employee is protected by anti-discrimination laws such as Title VII regardless of how long s/he has been on the job, but an employee is not eligible for FMLA leave until s/he has been employed for 12 months.  Thus, an employer policy that denies pregnancy leave during the first year of employment, but provides leave for other medical conditions, would discriminate against pregnant women in violation of Title VII.  Additionally, a neutral policy that prohibits any employee from taking sick leave or short-term disability leave during the first year of employment could have a disparate impact on women and thus violate Title VII.[20]

This fundamental shortcoming in Dr. Thornton's analysis is perhaps unsurprising; by its own terms, AT&T's Sales Attendance Guidelines ("SAG") policy also fails on this score. Pregnant workers consistently face roadblocks to access leave for their pregnancy-related absences, including ineligibility for

---

[20] U.S. Equal Employment Opportunity Commission, *Guidance: The Family and Medical Leave Act, the ADA, and Title VII of the Civil Rights Act of 1964* (Nov. 1, 1995).

protected forms of leave or having exhausted available leave, which other workers who are similar in their ability or inability to work do not face. Dr. Thornton's failure to understand the case is a consequence of AT&T's misunderstanding of the requirements of the PDA and its position that the FMLA is sufficient to protect the absences of ever-pregnant workers. It is clearly not enough, as demonstrated plainly by the sheer volume of denials that Dr. Thornton threw out of her data analysis due to ineligibility or exhaustion of FMLA – nearly *70 percent*.[21]

Expert witnesses need not be well-versed in the law of the case in which they offer their opinions, but Dr. Thornton's failure to understand Plaintiffs' claims renders her opinions unresponsive and unhelpful for the factfinder.[22] In her deposition, Dr. Thornton acknowledged that she did not know who are considered proper comparators of pregnant workers for purposes of understanding whether they have been accommodated and was unfamiliar with *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338 (2015), which affirmed and interpreted the PDA's directive

---

[21] *See* Plaintiffs' Reply in Support of Motion for Class Certification ("Pls.' Reply") at 7-8; Plaintiffs' Opposition to Motion to Exclude the Opinions of Janice F. Madden, Ph.D. ("Pls. Opp. Daubert") at 12-13.

[22] *See Palatka v. Savage Arms, Inc*., No. 1:10-CV-626, 2012 WL 12887774, at *4 (W.D. Mich. Apr. 12, 2012), *aff'd in part, rev'd in part and remanded*, 535 F. App'x 448 (6th Cir. 2013) ("To properly discharge its gatekeeping duty regarding the admissibility of these experts, however, the Court cannot evaluate these experts in a vacuum, but rather must consider their proposed testimony in view of the claims Plaintiffs raise in this case.").

that employers must accommodate pregnant workers as it does those who are "similar in their ability or inability to work."[23]

### 2. Removal of All Denials of Requests for Excused Absences for FMLA Ineligibility or Exhaustion Introduced Bias

The practices undertaken by Dr. Thornton and her team to eliminate those denials are unsound and impugn the results of her analysis so grossly that the Court should not consider the analysis. While she removed almost 70% of denials for ever-pregnant workers, her comparative removal for all workers only results in 53.9% of denials being removed.[24] In addition to having no legal or factual basis, Dr. Thornton's removal of this data – with a higher percentage of ever-pregnant workers' denials being removed than denials of all workers, "artificially decreases the denial rates disproportionately for the ever-pregnant workers, biasing her analyses of different outcomes under the SAG between ever-pregnant and non-pregnant workers."[25] This introduction of bias gives the Court further reason to

---

[23] Thornton Dep. 238:14–239:22, Ex. 2. She also demonstrated a misunderstanding of the pathways that pregnant AT&T workers can use for taking leave from work. She suggested that pregnant workers can potentially avail themselves of leave under *any* of the thirteen SAG-delineated categories and that workers have discretion as to which one to choose, neither of which is true. *See id.* 148:22-149:12, Ex. 2 ("How the ever-pregnant worker decides to use [the SAG excuses] or which ones to use would be at the discretion of the person and perhaps through consult with his or her supervis[or]."); Pls. Reply at 4 (discussing lack of discretion in administration of SAG policy and role of Centralized Attendance Group).

[24] Madden Rebuttal Rep. at 22, Ex. 49.

[25] *Id.* at 14, Ex. 49 (discussing Dr. Thornton's removal of denials based on FMLA ineligibility or exhaustion).

dismiss from its consideration Figure 2 and Tables 3–10 of Dr. Thornton's Rebuttal

Report.[26]

### 3. To Remove Denials for FMLA Ineligibility and Exhaustion, Dr. Thornton Used Highly Unreliable Variables

Dr. Thornton also failed in her analysis by relying on unvetted and unreliable

variables in AT&T's workforce data. At least two variables critical to Dr. Thornton's

Tables 3–10 and Figure 2—labeled "denial_reason" and "leave_no"— were either

verified[27] by reference to deficient and unreliable standards for data quality or not

verified at all.[28] Dr. Thornton testified that she used denial_reason to identify

---

[26] Thornton Dep. 144:22–145:7 (statement from Dr. Thornton that she removed workers marked as "ineligible" or "exhausted" in Tables 3–10 of her Rebuttal Report), Ex. 2.

[27] Dr. Thornton testified that she "reviewed the data and looked at the content of the output of the programs" used to produce the analysis in her Rebuttal Report. *Id.* 19:4-6, Ex. 2.

[28] Both denial_reason and leave_no originate in data files extracted from LeaveLink, the application that retail employees must use to seek certain excused absences. *See* Plaintiffs' Memorandum in Support of Class Certification ("Mem."), Dkt. 85-1, at 18-21. The denial_reason variable denotes whether an employee's leave request was denied and why. The leave_no variable is a unique identifier generated whenever an employee submits a request for leave. Dr. Thornton relied on both in her Figure 2 and Tables 3–10, *see* Thornton Dep. 179:19–22, Ex. 2. *See* Madden Rebuttal Rep. at 16-18 & n.16, Ex. 49.

However, Dr. Thornton analyzes the first row containing each worker's data for each day and captures only the *first* value listed for each denial_reason, and leave_no. As a result, Dr. Thornton is analyzing the final outcome (approved or denied) for the day; but she is associating that *final* outcome with the *first* leave number and denial reason.

The consequences of relying only on the first row of each worker's data are staggering: whether a worker's proper denial reason happens to appear in the first

workers who were ineligible for FMLA leave or who had exhausted their FMLA leave.[29] Dr. Thornton's usage of denial_reason and leave_no results in a dataset with more than 41,000 blank entries and renders her analysis "so unreliable that no reasonable expert could base an opinion on them," and "the opinion resting on that data must be excluded."[30]

In addition to the overwhelming flaws in her analysis flowing from the determination to remove all denials that were for reasons of FMLA exhaustion or ineligibility, Dr. Thornton's analysis of rates of denials of excused absences is also faulty because of her calculation of the proportion of requested days denied,[31] Dr. Thornton inaccurately compiled the outcomes (granted or denied) of requests for excused absences by failing to weight each request for excused absence by the

---

row and whether that reason makes it into Dr. Thornton's data is entirely unreliable. It is hardly a surprise, then, that Dr. Thornton finds more than 41,000 blank entries in the denial_reason value, representing about 15% of the total denials in her dataset, *see* Thornton Rebuttal Rep., App'x C: many of these are likely the result of Dr. Thornton's failure to appropriately check and verify the faulty cause of the blank value. When asked why she thought there might have been such a high number of blank values, she responded: "I don't know." Thornton Dep. 180:14, Ex. 2.

When asked if she had double checked the blank values against AT&T's data, Dr. Thornton stated, "No, because I relied on Dr. Madden's Table 1a," *Id.*180:19–20, but also acknowledged that she knew Dr. Madden had not relied on the denial_reason variable in her own analysis, *see id.*180:4–5, Ex. 2.

[29] *See* Thornton Dep. 176:16–22; 179:16–22; 180:1–5, Ex. 2.

[30] *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000); *see* Madden Rebuttal Rep. at 51, Ex. 49; *see also supra* note 25.

[31] Madden Rebuttal Rep. at 16, Ex. 49; Thornton Rebuttal Rep. at 26.

number of days in the request.[32] Dr. Thornton suggests that Dr. Madden must use an unweighted request for total days to maintain consistency with use of the t-test for statistical significance. However, Dr. Madden's usage of a t-test is appropriate because the sample size she uses is sufficiently large and there are other statistical measures that can be used.[33] Her usage of a t-test is not a sufficient reason to use the percentage of days denied in order to calculate the denial rates of excused absences without taking into account the number of days per request.  Dr. Thornton further justified her use of the proportion of requested days denied by making a strange and unfounded suggestion about the importance of measuring "connectivity" between days.[34]  But that – quite frankly – made no sense. It is unclear why linking the leave request to each day that was requested should affect measurement of the differences in denials of requests for excused absences between ever-pregnant workers and non-pregnant workers.

Dr. Thornton could not answer this question in deposition, and she failed to correctly compile the variable she set out to analyze (proportion of days approved in a given request).[35] In her calculation, she used an incorrect denominator for the

---

[32] Madden Rebuttal Rep. at 15-16, Ex. 49. Dr. Madden relies upon days as her measure—this provides a cleaner analysis with results that comport with the data. *id.* at 15, Ex. 49.

[33] *See* Pls.' Opp. Daubert at 8-9 (discussing use of t-test v. z-statistic).

[34] Thornton Dep. 123-128, Ex. 2; Madden Rebuttal Rep. at 16, Ex. 49.

[35] Madden Rebuttal Rep. at 17, Ex. 49.

denial rate and an incorrect numerator wrong where the approval for a particular day is tied to the wrong request. She seemed to understand that she had made a mistake on this during her deposition,[36] but she offered no correction.[37]

Figure 2 and Tables 3–10 must be excluded both on the basis of relevance and helpfulness to the trier of fact and on the basis of reliability. These biases and errors undermine both the relevance and reliability of Figure 2, and the reliability of Tables 3–10.

### C. Dr. Thornton Erroneously Calculated Approved Leave Requests, Dramatically Overstating Ever-Pregnant Workers' Access to Excused Absences

Dr. Thornton's shoddy statistical analysis and misunderstanding of Plaintiffs' claims is perhaps best illustrated in Figure 1 of Dr. Thornton's report. There, she purports to show that pregnant workers are not, in fact, adversely treated by AT&T because a majority of pregnant workers receive some approved short-term disability, FMLA leave, job accommodation, or leave of absence during their tenure with AT&T.[38] However, an overwhelming amount of this this "approved leave" is actually for the birth of their children and associated recovery. It is not for pregnancy. AT&T contends that pregnant workers have access to a variety of leave

---

[36] Thornton Dep. 135-137, Ex. 2; Madden Rebuttal Rep. at 17, Ex. 49.

[37] In addition, for Tables 3–6, she re-assigned ever-pregnant workers as non-pregnant (see further discussion of this issue *infra*). *See* Madden Rebuttal Rep. at 15, 54, Ex. 49.

[38] *See* Thornton Rebuttal Rep. at 10.

options under the SAG policy to excuse required absences, late arrivals or early departures, relying on Dr. Thornton's Figure 1.[39] This is simply not true: once approved leave for childbirth and recovery are removed, only about 43% of pregnant workers receive approved absences across all categories of leave.[40] Moreover, it is clear that FMLA leave is really the only viable option for securing excused absences for ever-pregnant workers at AT&T is FMLA leave (notably, (a) only 36.2% ever receive approval for FMLA leave, and (b) Dr. Thornton threw out all denials where a worker was ineligible or had exhausted FMLA).[41] Dr. Thornton's decision to include childbirth and recovery in Figure 1 to suggest that pregnant workers can access approval for excused absences under SAG leave options substantially skews her results. She has produced an analysis that is entirely untethered from Plaintiffs' claims and should be excluded as fundamentally unhelpful.

### E.    Dr. Thornton Re-Classified Known Pregnant Workers as Non-Pregnant, Skewing the Analysis

In both her analyses of requests for excuse absences and of the imposition of attendance-related discipline, Dr. Thornton frequently re-assigned certain pregnant workers to the non-pregnant comparator group (1) during the period when those workers are not pregnant, and (2) where workers had confirmed pregnancies but

---

[39] AT&T's Opposition to Plaintiffs' Motion for Class Certification ("Opp.") at 11; Thornton Rebuttal Rep. at 10, Figure 1.
[40] Madden Rebuttal Rep. at 7; Figure 1, Ex. 49.
[41] *Id.* at 8, 14, Ex. 49; *supra* § II.B.1.

were missing specific pregnancy dates in the data.[42] Analyzing outcomes by pregnancy status for the class period, Dr. Thornton categorizes workers who were pregnant  in the two years before the class period as non-pregnant workers. These are workers who were just recently pregnant in the data, and whether they suffer disproportionate rates of discipline or denials of excuses is relevant for Plaintiffs' claims. Reassigning pregnant workers into the group of non-pregnant workers biases the analysis and clouds the measurement of the effect of pregnancy on excuses and discipline.

As Dr. Madden explains, "[b]ecause the data clearly indicate that these women were recently pregnant, or even currently pregnant, and the analyses are being conducted to evaluate the potential effect of pregnancy on excused absence denial rates, the recently and potentially currently-pregnant should be removed from *both* categories of workers compared (ever-pregnant and non-pregnant)."[43] If pregnancy truly has an effect on discipline, then the recent pregnancy of the workers who Dr. Thornton re-assigns as non-pregnant obscures the interpretation of outcomes for the non-pregnant workers.[44] Treating workers who have recently been pregnant, or may currently be pregnant, biases Tables 2-10 and 15-22, undermines their reliability, and requires their exclusion.

---

[42] *Id.* at 15, 54, Ex. 49.

[43] *Id.* at 15, Ex. 49.

[44] *Id.* at 54, Ex. 49.

**F.    In Seeking to Rebut Dr. Madden's Analysis of Attendance-Related Discipline, Dr. Thornton Selectively Deleted Discipline Records for Pregnant Women**

In her effort to challenge Dr. Madden's highly statistically significant results showing that pregnant workers receive more attendance-related discipline than non-pregnant workers, Dr. Thornton also selectively deleted the disciplinary records of pregnant women, results reflected in her Tables 15-18. Dr. Thornton acknowledges this, stating that she "removed disciplinary actions for the ever-pregnant workers when the action occurred 1 year or more following the end of the pregnancy."[45] She does not delete the same records for non-pregnant workers. She does not explain or justify why this deletion is necessary for her analysis, nor provide any reason to suggest that workers cannot be disciplined for more than one year after their pregnancies for reasons related to their pregnancies. Worse still, she *includes* all the disciplinary actions taken against non-pregnant workers, regardless of the year or timeframe in which they occurred; Dr. Thornton "continues to include all of the disciplinary actions taken against the non-pregnant workers."[46] As Dr. Madden explains, had ever-pregnant and non-pregnant workers had identical discipline records, this deletion would provide results demonstrating that ever-pregnant workers are disciplined less than the non-pregnant workers – this "thumb on the

---

[45] Thornton Rebuttal Rep. at 48.
[46] Madden Rebuttal Rep. at 34, Ex. 49.

scale" "artificially decreases the discipline rates for ever-pregnant workers."[47] The deletion of data is skewed and renders Tables 15–18 and Dr. Thornton's associated discussion at pages 47–52 of her report fundamentally unreliable.

### G.    To Analyze Attendance Related Discipline, Dr. Thornton Created an Unreliable Measure of Tenure and Exposure Reflected Tables 15–22

In addition to deleting large amounts of relevant data and using flawed variables – both of which undermine the reliability of her analyses – Dr. Thornton also created unreliable measures in seeking to rebut Dr. Madden's analysis of attendance-related discipline. Her measurement of what she calls "tenure" (but which is actually an analytically muddled mash-up of tenure and exposure) as well as her use of "potential medical excuse" are not the result of the application of "generally reliable principles." Their exclusion falls squarely within the district court's role as a "gatekeeper" to the admission of scientific testimony.[48]

To ensure that she accounted for the length of pregnancy (roughly 9 months) as well as time working at AT&T  while not pregnant, Dr. Madden included a control[49] for "exposure" in her discipline analysis in her Table 2b, updated as Tables

---

[47] Madden Rebuttal Rep. at 34-35, Ex. 49.

[48] *See, e.g.*, *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1340 (citing *Daubert*, 509 U.S. at 589).

[49] "Controlling" for a variable essentially involves including it in an econometric analysis as an independent variable to mitigate the chance that the outcome observed is a result of that variable, instead of the effect of the variable that the researcher is attempting to isolate. *See, e.g.*, 1 Encyclopedia of Research Design, *Control Variables* (2010). For example, a researcher measuring the effect summer break

2b.1, 2b.2, and 2b.3 in her Rebuttal Report.[50] Exposure as the time during which an employee might have received discipline in a particular state – pregnant and non-pregnant.[51] Dr. Madden included exposure in her discipline analysis to eliminate the possibility that the discipline observed is simply a result of a worker employed with AT&T  for longer periods of time rather than her pregnancy.[52]

Dr. Thornton purported to include both exposure and an additional variable, "tenure," in her analyses of discipline records but does not actually include a measure of either.[53] Instead, she "lumps together the concepts of exposure and tenure in her analyses by creating an idiosyncratic measure of total time observed,"[54] constructing her own measure of time which is equal to the time the worker is observed for the initial period (such as pre-pregnancy) and then for the entire period (pre- + during + post-pregnancy).[55] In doing this, Dr. Thornton neither measures tenure (time worked at the company) nor exposure (time spent either pregnant or non-pregnant).[56] She adds the time period of pregnancy but not the disciplines

_____

from schools (independent variable) on ice cream sales (dependent variable) would likely want to control for outside temperature in her analysis.

[50] Madden Rebuttal Rep. at 39–43, Ex. 49.

[51] *Id.* at 55, Ex. 49.

[52] Madden Rep. at 20; Supplemental Report of Dr. Janice Madden Using Data Corrected by AT&T Mobility ("Madden Supp. Rep.") at 9; Madden Rebuttal Rep. at 37–38, Ex. 49.

[53] Madden Rebuttal Rep. at 38, Ex. 49.

[54] *Id.* at 44, Ex. 49.

[55] *Id.* at 37–38, Ex. 49.

[56] *Id.* at 38, Ex. 49.

imposed during pregnancy, which results in an understatement of the incidence of discipline.[57] This analytically unsound measure – neither accurately reflecting exposure nor tenure – makes her Tables 15–22 and associated discussion at pages 47–56 fundamentally unreliable.

So too does her use of "potential medical excuse" in Tables 15–18. In those tables, she compares the rate of discipline among ever-pregnant workers to the rate of discipline for non-pregnant workers with a potential medical excuse.[58] However, the definition of "potential medical excuse" is unclear. In one part of her report, Dr. Thornton states that the population of workers included in her Tables 15–18 are those who are reflected as having a leave of absence in the human resources data set (the SAP data), except for leave that was  military/work related, who took or requested short-term disability, requested a job accommodation, or requested FMLA leave.[59] Nowhere does she justify why these categories of workers can or should be grouped under the "potential medical excuse" moniker.

Using the backup data that Dr. Thornton provided, Dr. Madden pieced together how Dr. Thornton defined "potential medical excuse" and discovered the "potential medical excuse" comparator group is a function of selective deletion of data. First, by failing to utilize all available data to identify workers with medical

---

[57] *Id.*
[58] Thornton Rebuttal Rep. at 50; *see also* Thornton Dep. 192:8–193:9, Ex. 2.
[59] Thornton Rebuttal Rep. at 48; *see also* Thornton Dep. 193:13-18, Ex. 2.

excuses, Dr. Thornton's omitted more than *7000* workers with medically excused absences from her comparator group.[60]  In addition, Dr. Thornton appears to have made an error in compiling the data on discipline for those she categorized as having sought a medical excuse. She left out of the analysis 2,803 individuals who met her apparent conditions for having requested a medical excuse but who had no discipline record.[61] Dr. Madden explains that this omission is "particularly egregious because she is omitting those with lower (i.e., no) discipline. By deleting these individuals, she has 'a thumb on the scale' that artificially increases the discipline rates" for non-pregnant comparators.[62]

By failing to justify the removal of more than 7,082 comparators who actually received a medical excuse as well as removing 2,803 workers who apparently sought a medical excuse, according to what Dr. Madden was able to deduce to be Dr. Thornton's requirements, but had no discipline, Dr. Thornton's analyses in Tables

---

[60] Madden Rebuttal Rep. at 36, Ex. 49.

[61] *Id.* at 35.

[62] *Id.*. When presented with a hypothetical illustrating a selective deletion of discipline records for pregnant workers but not for those requesting other medical excuses, Dr. Thornton acknowledged that such an analysis "may" bias the results. *See* Thornton Dep. 214:8-16, 215:5-11, Ex. 2 ("Q: For the hypothetical where you've got ever-pregnant workers with ten disciplines and never-pregnant workers with ten disciplines, for both groups half of the disciplines occur in the period up to one year after their request and half appear more than one year after their request[.] . . . . In this hypothetical wouldn't the effect of truncating ever-pregnant workers disciplined at a year after their pregnancy while not doing that for non-pregnant workers result in the appearance that non-pregnant workers have more discipline? A: It may.").

15-18 as well as the associated discussion at pages 47–53 does not meet the standard for reliability as it biases the results in AT&T's favor without principle or explanation.

### H. Dr. Thornton's Analysis of Transfers and Promotions Reflected in in Figure 5 Must be Excluded Because it is Irrelevant

Dr. Thornton presents an analysis of transfers and promotions, which she contends undermines Plaintiffs' claims that AT&T's SAG policy harms pregnant workers, suggesting that there are no "tangible" effects associated with the denials of excused absences and mounting discipline.[63] AT&T argues—on the basis of this analysis—that it actually treats pregnant workers more favorably than non-pregnant workers.[64] This analysis does not show what it purports to show.

To do the analysis reflected in Figure 5, Dr. Thornton considers whether, *once a worker receives a disciplinary action*, that worker earns either a pay increase or a promotion within one year of receiving that disciplinary action.[65] Dr. Thornton concludes that that ever-pregnant workers are more likely to receive a promotion or a pay increase within one year of a disciplinary notice than non-pregnant workers.

---

[63] *See* Thornton Rebuttal Rep. at Figure 5, 44–46.

[64] Opp. at 33.

[65] *See* Madden Rebuttal Rep. at 47, Ex. 49; *see also* Thornton Dep. 186:12-15, Ex. 2 ("Q: And [the pay and promotions analysis] didn't account for the question of whether pregnant workers are more likely to receive discipline, right? A: That's correct.").

Dr. Thornton fundamentally misses the issue. Her analysis does not in fact examine "whether disciplinary actions are or are not linked to other employment outcomes."[66] Such a study would need to examine how discipline is linked to other employment outcomes. The relevant question that should be examined is: "is there evidence that works who disciplinary actions experience fewer promotions or transfers than non-disciplined workers?"[67] By failing to compare those who received no discipline to those who received discipline, Dr. Thornton cannot answer the relevant question. By conditioning the analysis on those who received discipline, she reaches a conclusion that appears favorable for AT&T but is actually unrelated to the claims in the case and is non-responsive to Dr. Madden's findings.

Dr. Madden conducts this analysis in her Rebuttal Report and, unsurprisingly, concludes that receiving *any* step in the progressive-discipline policy is strongly correlated with fewer promotions and lateral transfers.[68] Because Dr. Thornton's analysis in Figure 5 and associated discussion at pages 45–47 is irrelevant to Plaintiffs' claims and utterly un-responsive to Dr. Madden's analyses.

## III.   **CONCLUSION**

For all the foregoing reasons, Dr. Thornton's expert report and testimony as identified should be excluded.

---

[66] Madden Rebuttal Rep. at 48, Ex. 49.
[67] *Id.*
[68] *Id.*

Dated: June 2, 2021                         Respectfully submitted,

*/s/ Kalpana Kotagal*
Joseph M. Sellers*
Kalpana Kotagal*
Harini Srinivasan*
Cohen Milstein Sellers & Toll LLC
1100 New York Avenue, N.W.
East Tower, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
jsellers@cohenmilstein.com
kkotagal@cohenmilstein.com
hsrinivasan@cohenmilstein.com

Gillian L. Thomas*
American Civil Liberties Union Women's
Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
gthomas@aclu.org

Sean J. Young (GA Bar No. 790399)
American Civil Liberties Union Foundation
of Georgia, Inc.
1100 Spring Street, Suite 640
Atlanta, GA 30309
Telephone: (678) 981-5295
syoung@acluga.org

*Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to LR 5.1B and 7.1D of the Northern District of Georgia, that the foregoing PLAINTIFFS' MOTION TO EXCLUDE THE OPINION OF JANET R. THORNTON, PH.D. AND MEMORANDUM OF LAW IN SUPPORT, complies with the font and point selections approved by the Court in LR 5.1B. The foregoing pleading was prepared on a computer using 14-point Times New Roman font.


/s/     Kalpana Kotagal
Kalpana Kotagal

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

CYNTHIA ALLEN and KRISTINE WEBB,

        Plaintiffs,

v.

AT&T MOBILITY SERVICES LLC
a/k/a AT&T MOBILITY LLC,

        Defendant.

Case No. 1:18-CV-3730-WMR

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this 2nd day of June, 2021, I have electronically filed the foregoing PLAINTIFFS' MOTION TO EXCLUDE THE OPINION OF JANET R. THORNTON, PH.D. AND MEMORANDUM OF LAW IN SUPPORT with the Clerk of the Court using the CM/ECF System, which will automatically send e-mail notification of such filing to the following attorneys of record:

Kenneth W. Gage (*pro hac vice*)
Paul Hastings LLP
200 Park Avenue, 30th Floor
New York, New York 10166
Tel: (212) 318-6000
kennethgage@paulhastings.com

Christine Cedar (*pro hac vice*)

Paul Hastings LLP
2050 M Street NW, 11th Floor
Washington, DC 20036
Tel: (202) 551-1700
christinecedar@paulhastings.com

Alex J. Maturi (*pro hac vice*)
Paul Hastings LLP
71 S. Wacker Drive, Suite 4500
Chicago, Illinois 60606
Tel: (312) 499-6000
alexmaturi@paulhastings.com

Sheldon W. Snipe
AVP Senior Legal Counsel
AT&T Services, Inc.
675 West Peachtree Street, NW
Suite 4300
Atlanta, Georgia 30308
Tel: (404) 893-7953
ss5526@att.com

*Counsel for AT&T Mobility Services LLC*

/s/    *Kalpana Kotagal*
Kalpana Kotagal