# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| CYNTHIA ALLEN, *individually and on behalf of other similarly situated,* and KRISTINE WEBB,<br><br>　Plaintiffs,<br><br>　　v.<br><br><br>AT&T MOBILITY SERVICES, LLC *a/k/a* AT&T Mobility LLC,<br><br>　Defendant. | <br><br><br><br><br><br>CIVIL ACTION FILE<br>NO. 1:18-cv-03730-WMR |

## ORDER

This case is before the Court on Defendant's Motion to Exclude the Opinions of Janice F. Madden, Ph.D. [Doc. 105], and Plaintiffs' Motion to Exclude the Opinions of Janet R. Thornton, Ph.D. [Doc. 117]. After considering the parties' arguments, applicable law, and all appropriate matters of record, the Court rules that both Motions [Doc. 105; Doc. 117] are **DENIED**.

### I.     FACTUAL BACKGROUND

This lawsuit arises out of Plaintiffs' claims that Defendant discriminated against them by refusing to excuse absences for pregnancy, childbirth, and related medical conditions under its Sales Attendance Guidance ("SAG") policy. [Doc. 50 at 4 ¶4]. The SAG policy imposes a "point" (or a fraction of a point) against an

employee for unexcused absences, late arrivals, or early departures from work. [Id. at 4 ¶5]. When an employee accumulates enough points, the employee is subject to termination. [Id.]

Although the SAG policy includes a list of situations in which absences, late arrivals, or early departures would be excused, the list does not include pregnancy, childbirth, and pregnancy-related medical conditions. [Id. at 4 ¶6]. Plaintiffs allege that, in applying the attendance provisions of the SAG policy, Defendant assigned points to Plaintiffs for absences, late arrivals, and early departures that were attributable to their pregnancy, childbirth, or pregnancy-related medical conditions, but not to other individuals who were similarly unable to be at work for non-pregnancy-related reasons. [Id. at 5 ¶8]. Plaintiffs suggest that, because the accumulation of points can lead to attendance-based disciplinary action, Defendant's refusal to excuse absences, late arrivals, and early departures that are related to pregnancy, childbirth, or pregnancy-related medical conditions has the effect of punishing employees who require absences for those protected reasons. [Id. at 5 ¶9].

Further, Plaintiffs contend that the Defendant's application of the SAG policy has a disparate impact on, and constitutes disparate treatment of, certain female employees who are affected by pregnancy, childbirth, or pregnancy-related medical conditions. [Id. at 5 ¶10]. Consequently, Plaintiffs have filed this lawsuit asserting Title VII claims "on behalf of themselves and all non-exempt, non-managerial

female employees in [Defendant's] corporate stores nationwide whose absences for pregnancy, childbirth, or related medical conditions at any time from April 26, 2017, to the present were not excused under [Defendant's] SAG policy." [Id. at 5-6 ¶11].

To support their claims, Plaintiffs retained Janice F. Madden, Ph.D., an expert labor economist, to analyze whether Plaintiffs and other pregnant employees of Defendant suffered adverse employment consequences as a result of absences, early departures, and tardiness due to their pregnancies during the time period from April 26, 2015, to September 30, 2019. [Doc. 85-25 at 2]. According to her report, Dr. Madden compared Defendant's pregnant employees to Defendant's non-pregnant employees and found that pregnant employees were less likely to have their requests for excused absences granted than were non-pregnant workers or workers whose conditions were recognized by the SAG policy. [Id. at 4]. Dr. Madden found that pregnant employees were "more likely to be subject to each pre-termination stage (counseling, written warning, and final written warning) in the disciplinary progression" than their non-pregnant counterparts. [Id.] Dr. Madden also compared pregnant employees' attendance discipline records from the time period before they became pregnant to the time period after they became pregnant [id. at 20-21] and concluded that "[w]hen workers became pregnant, they were more likely to be subject to attendance discipline ... than they were before they were pregnant." [Id. at 4]. Dr. Madden determined that, even though pregnant employees experienced a

significantly greater incidence of counseling and written warnings than non-pregnant workers or workers whose conditions were recognized by the SAG policy, pregnant workers were not more likely to be recorded as involuntarily terminated. [Id.]

To rebut Dr. Madden's expert opinion, Defendant retained Janet R. Thornton, Ph.D., an expert in economic and statistical analysis, to evaluate Dr. Madden's findings. [Doc. 104-7 at 7, 9]. Dr. Thornton disagreed with Dr. Madden's analysis for several reasons.

In rebutting Dr, Madden's analysis regarding the excused absences and requests for excused absences, Dr. Thornton had the following criticisms: (1) Dr. Madden focused solely on Family and Medical Leave Act (FMLA) requests and failed to fully incorporate the requirements of being eligible for FMLA and the restrictions on the allowance for FMLA leave; (2) when she compared the pregnant workers' absence requests to the non-pregnant workers' absence requests, Dr. Madden included FMLA leave requests from both before and after the pregnancy period; (3) Dr. Madden's unit of analysis was the day of the request even though a leave request may consist of multiple days; and (4) by focusing solely on FMLA leave requests, Dr. Madden ignored, at a minimum, the availability of short-term disability and job accommodations. [Doc. 104-7 at 9–10].

4

Regarding Dr. Madden's analysis of the disciplinary action data, Dr. Thornton had the following criticisms: (1) Dr. Madden did not differentiate between workers who sought an excuse for their absence and those who did not; and (2) Dr. Madden's analysis did not account for AT&T's progressive disciplinary system that results in an increase in discipline over time for a given worker." [Doc. 104-7 at 10–11].

After making what she believed to be the necessary corrections to the analysis, Dr. Thornton made several key findings to rebut those of Dr. Madden. [Id. at 11-12]. In summing up her rebuttal report, Dr. Thornton concluded that "when more appropriate comparisons are made, ... there is *not a pattern* of higher unexcused absences or disproportionately more disciplinary actions against ever-pregnant workers." [Id. at 13].

Each party has now filed a motion to exclude the opposing party's expert testimony.[1]

## II.   DISCUSSION

Federal Rule of Evidence 702 provides that a witness may testify as an expert if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the

---

[1] Of course they have. Filing a daubert motion to exclude an opposing party's expert witness is now standard procedure in nearly every Federal case. In fact, this tactic has become so automatic that the Court fears that legitimate challenges may sometimes get covered up in a "tsunami" of tactical filings.

testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"[T]he purpose of the expert admissibility rules is to enlist the federal courts as 'gatekeepers' tasked with screening out 'speculative' and 'unreliable expert testimony.'" MidAmerica C2L Inc. v. Siemens Energy Inc., 25 F.4th 1312, 1326 (11th Cir. 2022) (quoting Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010)). "The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

Accordingly, district courts must consider the following when determining the admissibility of expert testimony: (1) whether the expert is qualified to testify competently regarding the matters he intends to address; (2) whether the methodology the expert used to reach his conclusions is "sufficiently reliable" under the Daubert inquiry; and (3) whether the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chems., Inc.,

158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert, 509 U.S. at 589).  The proponent of the expert testimony bears the burden of demonstrating the testimony's admissibility by a preponderance of the evidence.  See McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)).

The Eleventh Circuit has stated that "rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology."  MidAmerica, 25 F.4th at 1327 (alteration in original) (quoting McCorvey, 298 F.3d at 1257).  In determining the reliability of expert testimony, courts should consider, to the extent possible: "(1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community."  Id. (citing Daubert, 509 U.S. at 593–94).  However, this is not an exhaustive list of things that a trial court may consider when determining the admissibility of expert testimony, and the Supreme Court has clarified that a district court should consider other factors when appropriate.  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (citing Kumho Tire, 526 U.S. at 150).  "District courts 'have substantial discretion in deciding how to test an expert's reliability . . . .'"  Rink v. Cheminova, Inc., 400 F.3d 1286, 1292

7

(11th Cir. 2005) (quoting United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999).

However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . . Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting Daubert, 509 U.S. at 596).

### A. Defendant's Motion to Exclude the Opinions of Dr. Madden

In its motion to exclude Dr. Madden's testimony [Doc. 105], Defendant does not challenge Dr. Madden's qualifications.[2] Defendant's arguments concern the reliability of Dr. Madden's analyses and whether her testimony would assist the trier of fact.

Defendant argues that Dr. Madden failed to properly compare Defendant's application of its SAG policy to pregnant employees with Defendant's application of its SAG policy to non-pregnant, but similarly situated, employees. [Doc. 105 at

---

[2] Dr. Madden is a labor economist and econometrician with extensive experience in the analysis of labor markets. [Doc. 85-25 at 2]. Her research has been peer reviewed and competitively funded by a variety of government agencies and private foundations, and she has trained federal judges on the use of statistics and economic data in litigation. Further, Dr. Madden has extensive experience related to labor issues, including testifying as an expert witness on labor economics and statistics in over 45 cases in federal and state courts. [Id. at 3–4].

8

6-7]. Specifically, Defendant asserts that Dr. Madden failed to properly define the protected and majority groups in her analysis and that Dr. Madden did not account for non-discriminatory factors that Defendant could have referenced in making its disciplinary decision. [Id. at 10-11]. Defendant also argues that Dr. Madden: (i) failed to take into account the fact that FMLA, Short Term Disability, and Job Accommodation excuses were available to pregnant employees; (ii) improperly counted incidents of employee discipline under the SAG policy as being pregnancy-related; and (iii) failed to take into account that fact that incidents of discipline under the SAG policy increase over time for employees as they have greater opportunities for absences. [Id. at 16-19]. Defendant contends that, when Dr. Madden's alleged errors are just partially corrected, the data suggest that there is actually a pattern of favorable treatment for Defendant's pregnant employees. [Id. at 27]. Thus, Defendant argues that Dr. Madden's analyses are not reliable and would not assist the trier of fact to better understand the evidence or determine a fact in question.

Upon review, the Court finds that Dr. Madden's analysis is sufficiently reliable and that her testimony would assist the trier of fact. Dr. Madden identified Defendant's employees who were pregnant at any time from April 26, 2015, through September 30, 2019. To assess whether pregnancy affected requests for an excused absence or resulted in involuntary terminations for attendance violations, Dr. Madden used similarly situated female workers who were not pregnant, as well as

male employees, as comparator groups. Because the SAG policy did not excuse absences due to pregnancy, but did excuse absences for other reasons, Dr. Madden also used as a comparator group those employees who had requested excused absences for the listed reasons, but were denied. Dr. Madden then compared the denials of requests for excused absences and the disciplinary statuses of pregnant workers to that of the comparator groups. [Doc. 85-25 at 8-14]. Dr. Madden also compared the denials of excused absence requests for pregnant employees to their own pre-pregnancy attendance discipline. [Id. at 14-16]. After analyzing the statistical data that she compiled, Dr. Madden concluded that, in some respects, the SAG policy treated Defendant's pregnant employees less favorably than Defendant's non-pregnant employees. [Id. at 4]. The Court finds that there is nothing regarding this methodology that would require a finding that Dr. Madden's analysis is not sufficiently reliable.

Defendant's arguments to exclude Dr. Madden's testimony are essentially challenges to the degree of accuracy or persuasiveness of Dr. Madden's opinions. But, the Court does not consider the persuasiveness of an expert's testimony under Rule 702; such matters are more appropriately addressed on cross-examination. See Quiet Tech., 326 F.3d at 1341. As the Court finds that Dr. Madden's opinions are sufficiently reliable and her testimony regarding her analysis would help the trier of fact in determining whether Defendant's SAG policy treated Plaintiffs less favorably

than non-pregnant employees, Defendant's motion to exclude Dr. Madden's testimony is DENIED.

### B. Plaintiff's Motions to Exclude the Opinions of Dr. Thornton

Like Defendant, Plaintiffs do not challenge Dr. Thornton's qualifications in their motion to exclude her testimony.[3] [Doc. 117-1]. Plaintiffs' arguments concern the reliability of Dr. Thornton's analyses and whether her testimony would assist the trier of fact. [Id. at 5].

Dr. Thornton was retained by Defendant to analyze the statistical data and rebut Dr. Madden's findings and conclusions. [Doc. 104-7 at 8]. Dr. Thornton provided several reasons why she believes Dr. Madden's analysis is not completely accurate,[4] and most of Dr. Thornton's objections relate to how Dr. Madden analyzed the excused absence requests and disciplinary action records. [Id. at 9–11].

In moving to exclude Dr. Thornton's opinions, Plaintiffs argue that her analyses and conclusions are not accurate because she made adjustments to, and

---

[3] Dr. Thornton is a Managing Director for a consulting firm that specializes in the application of economic, econometric, and statistical analysis for litigation, regulatory compliance, and risk assessment matters. [Doc. 104-7 at 7]. Dr. Thornton holds a bachelors, masters, and doctoral degree in economics, has more than thirty years of experience in the area of labor econometrics, and has performed research and analyzed data in matters involving allegations of discrimination in a variety of employment practices. [Id.].

[4] These reasons were offered in support of Defendant's motion to exclude the opinions of Dr. Maddox and are referenced in subsection II A of this Order.

deletions from, what they believe to be relevant data. [Doc. 117-1 at 6]. Specifically, Plaintiffs contends that Dr. Thornton: (i) removed about 70% of the denials of pregnant workers' excused-absence requests from her analysis; (ii) overstate pregnant employees' approved leave requests by including approved leave requests for childbirth and associated recovery; (iii) reclassified some pregnant workers as non-pregnant workers; (iv) did not include all discipline records for pregnant women; (v) used an unreliable measure of tenure and exposure to analyze attendance related discipline; and (vi) included irrelevant employee transfers and promotions in her analysis. [Doc. 117-1 at 9–27].

Although Dr. Thornton made some changes to the variables that Dr. Madden had relied upon, Dr. Thornton used much of the same data as Dr. Madden.  As is often the case with statistical analyses, opposing experts can manipulate certain variables to include or remove certain aspects to support their respective positions. That does not necessarily make their respective analyses unreliable, but it may have a bearing on which expert the trier of fact finds to be more accurate or persuasive based on the particular facts of the case.

Here, the underlying basis for two experts' analyses was the same — to ascertain whether Defendant's application of its SAG policy treated pregnant employees differently than non-pregnant employees.  Essentially, Dr. Thornton analyzed Dr. Madden's methods, disagreed with her analysis, conducted her own

analysis with what she believed to be the proper variables, and reached a different conclusion.

As was the case with Defendant's motion, the Court finds that Plaintiffs' arguments in support of their motion to exclude are best thought as reasons why Dr. Thornton's analysis is not as accurate or persuasive as Dr. Madden's. These matters are more appropriate for cross-examination. The Court's role in determining the admissibility of expert testimony under Rule 702 does not include analyzing the degree of accuracy or the persuasiveness of the experts' testimony; that job is reserved for the trier of fact at trial. See Quiet Tech., 326 F.3d at 1341.

### III.   CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to Exclude the Opinions of Janice F. Madden, Ph.D. [Doc. 105] and Plaintiffs' Motion to Exclude the Opinions of Janet R. Thornton, Ph.D. [Doc. 117] are **DENIED**.

**IT IS SO ORDERED**, this 21st day of March, 2022.

_William M. Ray II_
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE